PEERLESS INSURANCE COMPANY, a
corporation, Appellant,

v.

INLAND MUTUAL INSURANCE COM-
PANY, a corporation, Appellee.

No. 7524.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 20, 1957.

Decided Jan. 6, 1958.

Robert W. Lawson, Jr., and Charles W. Yeager, Charleston, W. Va. (Steptoe & Johnson, Clarksburg, W. Va., on brief), for appellant.

L. E. Woods, Jr., and C. F. Bagley, Jr., Huntington, W. Va. (Campbell, McNeer & Woods, Huntington, W. Va., on brief), for appellee.

Before PARKER, Chief Judge, HAYNSWORTH, Circuit Judge, and R. DORSEY WATKINS, District Judge.

R. DORSEY WATKINS, District Judge.

Inland Mutual Insurance Company (Inland) issued a policy to Lota H. Yeatts, trading as Yeatts Transfer Company (Yeatts) against liability for personal injuries arising out of the operation of insured vehicles to the extent of $15,000 for injuries to any one person in any one accident. Pursuant to a reinsurance treaty with Peerless Insurance Company (Peerless), Inland retained $5,000 of this coverage, and ceded the excess to Peerless. While the policy and reinsurance treaty were in effect, Yeatts was sued by John J. Arms; during the litigation an opportunity arose to settle the suit within the policy limits but this was not done; a verdict substantially in excess of the policy limits was obtained against Yeatts; Yeatts sued Inland for alleged negligence and bad faith in failing to settle the Arms v. Yeatts suit; Inland settled the Yeatts suit, and brought this action against Peerless to

recover two-thirds of the amount so paid in such settlement and associated expenses, and two-thirds of the expenses incident to the defense of the Arms-Yeatts suit.

The district court, sitting without a jury, rendered verdict for Inland. The case, one of first impression, is here on appeal from that judgment.

*The Reinsurance Agreement.*

On August 6, 1947, Inland and Peerless entered into a reinsurance treaty or agreement, the relevant portions of which read as follows:

"Article I.

"Classes of Business Reinsured:

"The Company will reinsure with the Reinsurer and the Reinsurer will accept reinsurance from the Company as set forth in Exhibits 'A', 'B' and 'C', which are attached hereto and made a part of this Agreement, such Exhibits being entitled for the purpose of identification as follows:

"Exhibit A—Excess Reinsurance of Third Party Personal Injury Liability Business * * * "

"Article III.

"Liability of Reinsurer:

"The actual payment by the Company of any loss shall be a condition precedent to any recovery under this Agreement, and subject to such condition, the liability of the Reinsurer shall follow that of the Company in every case and shall be subject in all respects to all the general and special stipulations, clauses, waivers and modifications of the Company's policy, binder, or other undertaking, and any endorsements thereon.

"No error or omission in reporting any risk reinsured or marked to be reinsured shall invalidate the liability of the Reinsurer; but the reporting of reinsurance not authorized by this Agreement or by special acceptance hereunder shall not bind the Reinsurer except for the return of premiums paid therefor."

"Article IV.

"Claims:

"The Company will advise the Reinsurer promptly of all claims and any subsequent developments pertaining thereto, which may in the Company's opinion develop into losses involving reinsurance hereunder. Inadvertent omission in dispatching such advices shall in no way affect the liability of the Reinsurer under this Agreement, provided the Company informs the Reinsurer of such omission or oversight promptly upon its discovery.

"When so requested, the Company will afford the Reinsurer an opportunity to be associated with the Company, at the expense of the Reinsurer, in the defense or control of any claim or suit or proceeding involving this reinsurance, and the Company and the Reinsurer shall cooperate in every respect in the defense of such suit or claim or proceeding.

"All court costs and expenses, including interest on judgments, paid by the Company, (excluding salaries of permanent officials and employees of the Company) connected with any resistance to, investigations of, or negotiations concerning settlement of such claims, shall be apportioned in proportion to the respective interests as finally determined."

"Exhibit A

Excess Reinsurance of Third Party Personal Injury Liability Business

"Section 1.

"Cover:

"As respects Third Party Personal Injury Liability Business of the Company (except as hereinafter excluded), becoming effective at and after 12:01 a. m., August 1, 1947, (including renewals), the Company will pay the amount of loss, including damages for care and loss of services, arising out of personal injury to or death of one person in any one accident (hereinafter called the First Limit), and, subject, to the foregoing

provision respecting each person, the amount of loss, including such damages, arising out of personal injury to or death of two or more persons in any one accident (hereinafter called the Second Limit), set forth below as 'Company's Retention'; and the Company will reinsure with Reinsurer on the Excess basis and the Reinsurer will accept all excess loss above the primary loss paid by the Company, provided the loss to the Reinsurer shall not exceed the amounts set forth below as 'Maximum Amount to be Reinsured With Reinsurer:'

| "Company's Retention | | Reinsured with Reinsurer Maximum Amount to be | |
|---|---|---|---|
| First Limit | Second Limit | First Limit | Second Limit |
| $5,000. | $10,000. | $95,000. | $290,000." |

"Section 3.

"Premium:

"For reinsurance provided hereunder the Company shall pay to the Reinsurer a premium determined by applying to the premium charged by the Company for basic limits of coverage the appropriate factors contained in the excess tables of the Standard Manual approved by the National Bureau of Casualty & Surety Underwriters."

### The Liability Insurance Policy.

On March 28, 1951, while the reinsurance agreement was in effect, Inland issued to Yeatts a standard vehicle liability policy with a limit of $15,000 for injury to any person in any one accident. The pertinent portions of the policy provide:

"Inland Mutual Insurance Company (A mutual insurance company, herein called the Company)

"Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

"Insuring Agreements

"I. Coverage A—Bodily Injury Liability

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile.

"II. Defense, Settlement, Supplementary Payments

"As respects the insurance afforded by the other terms of this policy under coverages A and B the company shall:

"(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

\* \* \* \* \* \*

"(c) pay all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the company has paid, tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon; \* \* \*"

Under the reinsurance agreement, Peerless was ceded the excess $10,000, and was paid the appropriate portion of the entire premium paid by Yeatts.

### Arms v. Yeatts

On April 20, 1951, while the liability policy and reinsurance agreement were in effect, a collision occurred in Fairfax County, Virginia, between a truck owned by Yeatts and operated by Yeatts' employee, and an automobile driven by John J. Arms, in which Arms sustained severe permanent injuries. Inland, on April 23, 1951, received a preliminary

notice of the accident from a Washington, D. C., adjusting firm. Inland set up a reserve of $1,500. On April 30, 1951, upon receipt of a further report from the adjusting company, Inland increased the reserve to $3,500. After further investigations and reports, Inland, on September 21, 1951, again increased its reserve, this time to $7,500, and for the first time notified Peerless of the accident on a "Preliminary Loss Advice" form provided by Peerless.

On October 4, 1951, Sherwood, Assistant Secretary of Peerless, and charged with supervision of reinsurance accounts and the establishment of Peerless reserves thereon, came to Inland's office, and reviewed several files, including the Arms-Yeatts file. Sherwood discussed the Arms case with Talbott, Inland's claims supervisor. Sherwood was an attorney and a former claims adjuster, having worked for some years in Virginia, where the Arms injuries occurred. He regarded the Arms case as one of liability. On the other hand Talbott, and his superior, Polk, always considered the case as one of no liability, primarily because of what they believed to be contributory negligence by Arms as a matter of law. Before his departure, Sherwood put a memorandum in Inland's file on Yeatts, in which he expressed the opinion that "This is undoubtedly a liability case * * *."

Sherwood suggested that a home office man of Inland be sent to Delaware, where Arms was then residing, and that it be explained to Arms' attorney that Inland's policy was only for $15,000. On December 1, 1951, when Sherwood learned that his recommendation had not been followed, he raised Peerless' reserve from $3,000 to $9,000. On December 10, 1951, an adjuster for Inland wrote Sherwood, giving a résumé of the medical reports on Arms, indicating permanent total disability, and reporting that Arms' special damages then amounted to $2,565.

Arms' attorneys had initially used a settlement figure of $60,000–$65,000. On December 18, 1951, Inland inquired if settlement could be effected for $6,500, but this was declined. It does not appear that Peerless was advised of this development.

On February 4, 1952, Arms sued Yeatts in Fairfax County, Virginia, claiming damages of $125,000. Inland retained the law firm of Barbour, Garnett, Pickett & Keith, and Pickett of that firm, a competent and experienced trial lawyer in negligence cases, assumed primary responsibility. Inland suggested that the case be removed to the United States District Court, but accepted Pickett's recommendation to the contrary. On February 14, 1952, Talbott wrote Sherwood, advising of the institution of suit, and the employment of Pickett. Peerless never objected to such employment, and did not avail itself of its right, under Article IV of the reinsurance treaty "to be associated with" Inland "in the defense or control of any claim or suit."

On March 31, 1952, Talbott again wrote Sherwood, stating that he was asking Pickett for a review of the file and his appraisal of the case. Talbott also referred to a rumor that Arms was not badly hurt, but expressed doubt as to its accuracy, since "our own physician's report was so definite as to seriousness of this man's injuries * * *."

Talbott also wrote Sherwood on June 11, 1952, enclosing a copy of a letter of March 26[1] from Inland's attorneys, "which sets out their opinion as to this claim." It also quoted from a letter from them of March 28, stating that McCandlish (Yeatts' attorney) agreed that "Arms was guilty of gross negligence" which "should prevent a recovery, but he is fearful that if the Court should allow the case to go to the jury a large verdict would be returned. Of course, he is trying to play safe for his client and would like to have the case settled within the limits of the policy, but I am still of the

---

1. Not in the record on appeal.

opinion that the case should be fought to the limit, and I am further of the opinion that if the evidence develops along the line of statements in the file, the Court will grant a motion to strike the evidence which will have the effect of taking the case away from the jury."

On June 12, 1951, Polk wrote to Sherwood, referring to Peerless' reserve of $9,000, stating that liability was questionable and the case could probably be settled for $12,500. He concluded, however, that in view of the serious injuries it was almost impossible to predict what a jury would do on the defense of contributory negligence.

The Arms-Yeatts case came to trial on October 29, 1952, on which day the testimony was completed. The next morning, before counsel appeared in court to discuss proposed instructions to the jury, Arms' counsel for the first time receded from his settlement figure of $60,-000 and indicated a willingness to settle for $20,000. Yeatts' attorney, McCandlish, as was apparently Pickett, was strongly of the belief that the case could be settled for $17,500. Yeatts was willing to contribute $2,500 to a $17,500 settlement, and McCandlish warned Pickett that Yeatts would hold Inland liable for any recovery in excess of the policy limits of $15,000. Pickett telephoned Talbott and advised him of this development, but expressed the opinion that the verdict would be for the defendant, or that at least some of the jurors would use Arms' contributory negligence as grounds for a low verdict. He refused to recommend a settlement above $7,500, and characterized even that figure as a "gift".

Talbott discussed this with his superiors, who told him to follow Pickett's advice, since he was much more familiar with the progress of the trial than anyone at the home office. In further explanation, Polk later testified that he agreed wtih Talbott on the absence of liability, and that the abrupt reduction

of plaintiff's settlement figure from some $60,000 to $17,500, supported this judgment and led Polk to believe that a still lower figure would be accepted.

Talbott then telephoned Sherwood in New York. Both men dictated memoranda of the conversations immediately after the conclusion of the call. The memoranda are in substantial agreement as to the nature of the negotiations,[2] and the ultimate authorization. Talbott's memorandum in part reads:

"I then called Mr. Sherwood and he said he would go along with any recommendations we had to make and I suggested that if the suit could be settled for $7500.00 we had better go ahead and settle same to which he agreed. I then called our attorney and told him that we would reluctantly pay as much as $7500.00 to settle the suits * * *."

This subject is covered in Sherwood's memorandum as follows:

"Mr. Talbott stated his attorney recommended a top of $7500 or let the case go to the jury for a decision, as he was confident of winning the law suit.

"Mr. Talbott stated that he did not want to recommend payment of $7500 and I replied that it would be agreeable to us to pay $7500 and also left the decision in his hands as he has direct control of the case."

Both memoranda reflect Sherwood's suggestion that if the case went to the jury, an instruction should be requested that any amount awarded would be free of income taxes.

Talbott's and Sherwood's testimony in this case amplifies their memoranda as to the scope of the discussions. Talbott testified that in the October 29, 1951 telephone call, he and Sherwood repeated their positions as to liability, Sherwood again stating that the case was a dangerous one, but not saying that Inland should pay up to the policy limits. Sher-

2. Both memoranda recognize that the only offer from Arms was $20,000, but McCandlish and Pickett assumed the case could be settled for $17,500, and this entire litigation has proceeded on such assumption.

wood agreed that he and Talbott in this conversation maintained their respective evaluations, Talbott still contending that there was no liability; Sherwood insisting that the case was a very dangerous one in that there were severe injuries, high special damages, and liability. He said he told Talbott "with the injuries that bad, and the facts which I had been shown from the very beginning, and told him to settle and save anything he could on this policy, but whatever he did was in his province and in his control. Nothing I could do."

The $7,500 counter-offer was rejected. The case went to the jury, which promptly returned a verdict for Arms in the amount of $75,000. Motions for judgment n. o. v., for a new trial, and for writs of error were unsuccessfully made. Inland paid Yeatts $15,000, and Peerless paid Inland $10,000. Arms attempted to collect from Yeatts, and issued writs of attachment against some of Yeatts' trucks. The attachments were lifted on Yeatts making a payment on account, and agreeing to make further installment payments. Yeatts sued Inland in the Hustings Court of the City of Richmond for $60,000, the difference between the $15,000 face amount of the policy, and the judgment against Yeatts for $75,000. Because of problems of venue and jurisdiction, this case was dismissed by the plaintiff.

Thereafter, on January 6, 1954, Yeatts sued Inland in the Virginia State courts, in a declaratory judgment proceeding, in which Yeatts sought to have Inland declared liable for $60,000, the excess of the Arms judgment over Inland's policy, and $100,000 damages to Yeatts' business occasioned by Arms' efforts to collect his judgment. The asserted basis of liability was Inland's negligence and bad faith in failing to settle the Arms litigation for $17,500. The case was removed to the United States District Court for the Eastern District of Virginia.

Peerless was promptly notified of the declaratory judgment suit. It denied liability and declined to participate in the litigation, but suggested that thought be given to joining Pickett as a third-party defendant. Inland regarded this as bad strategy, and it was not done. A motion for summary judgment was denied [3], and the case was set for trial by a jury. Before trial a settlement was worked out (of which Peerless was advised) under which Inland paid Yeatts $27,500 in full settlement of the Yeatts suit, and Yeatts paid Arms this $27,500 together with an additional $30,000 (the face amount of the policy together with $15,000 contributed by Yeatts), or a total of $57,500, for the release of the Arms judgment of $75,000.

The instant suit was then commenced by Inland against Peerless, in the United States District Court for the Southern District of West Virginia. Inland initially claimed the full $27,500 it paid in settlement of the Yeatts declaratory judgment suit. Later this was reduced to two-thirds of that amount. Inland also claimed Peerless' "proportionate share" of the expenses of investigating and defending the Arms-Yeatts suit and the Yeatts-Inland suit.

Peerless answered, denying liability for any amount except two-thirds of the costs of defending the Arms-Yeatts suit. By its answer and special defenses, Peerless contended that (a) Inland did not keep Peerless fully informed of the Arms claim, or the progress of the litigation; (b) that direct and sole control over the Arms case was vested in Inland, and that there was no occasion to clear any settlement or obtain Peerless' permission to any settlement within the policy limits of $15,000; (c) that Peerless' maximum liability under the Yeatts policy (exclusive of expenses) was $10,000, which Peerless had paid; and (d) the Yeatts-Inland suit was based upon alleged negligence and bad faith of Inland in failing to settle the Arms suit;

3. The record indicates that the District Judge expressed considerable doubt whether the complaint alleged facts con- stituting negligence or bad faith, but felt that disputed issues of fact were raised, precluding summary judgment.

that Inland in said suit and at all times has denied negligence and bad faith; that without any adjudication on that point, Inland paid $27,500; that if Inland paid $27,500 because of the belief it was guilty of negligence and bad faith, there would be no coverage under the reinsurance treaty; and if Inland denied negligence and bad faith "but made the settlement for some other reason" there would be no coverage under the reinsurance treaty.

When the case came on for trial before the District Judge without a jury, extended opening statements were made, in the course of which the court several times defined the issues, although not always in precisely the same terms. In substance, the issues so determined, with the concurrence of counsel, were: (1) Was Peerless adequately informed of Inland's handling of the Arms claim; and (2) was Peerless' participation in the Arms-Yeatts case settlement negotiations such as to impose liability when the recovery in that suit exceeded the policy limits.[4]

In the course of the fixing of the issues, counsel for defendant stated that they were waiving the defense based upon the contention that the question of bad faith and negligence had never been judicially determined; and stated that it would be immaterial whether Inland paid $27,500 to settle the Yeatts-Inland suit as a matter of business judgment, or in satisfaction of a judgment obtained in that litigation; that the payment was not covered by the reinsurance treaty, irrespective of what Inland did or did not do.[5] This waiver materially reduces the scope of review as well as the difficulty of solution of the problems remaining for determination.

### Inland's disclosures to Peerless.

We agree with the finding of the District Court that "Looking at the evidence as it developed in 1951 and 1952 * * * Inland kept Peerless fully and adequately informed of the significant developments in the case of Arms v. Yeatts."

First. Article IV of the reinsurance treaty, quoted in full above, expressly excuses inadvertent omission in promptly advising Peerless "of all claims and any subsequent developments pertaining thereto, which" in Inland's opinion may "develop into losses involving reinsurance * * *" if such information is promptly given upon discovery of the omission. While the initial report of claim was tardy, it is consistent with Inland's early estimate that the case would not involve over $5,000.

Second. At his October 4, 1951, visit, Sherwood of Peerless made an appraisal of the seriousness of the case from which he never receded. At least from then on, Peerless was promptly advised of developments, which were few, and relatively insignificant, until October 29, 1952, when Arms for the first time reduced his settlement figure from $65,000. Certainly on that date Sherwood had all the information possessed by Inland.

### Liability as between Inland and Peerless.

Inland's obligations to Yeatts under the contract of insurance were "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of" personal injuries sustained by any person, and "caused by accident and arising out of the ownership, maintenance or use of the automobile" involved in the colli-

4. The court suggested that involved in this second issue was the question of whether or not Pickett, who represented Inland in the Arms suit, was "also the agent of Peerless". In its opinion now reported in D.C., 152 F.Supp. 506, the court stated this question as a separate issue. In their briefs and argument, the parties have not considered it necessary to treat this as an independent cause of action or defense. The view we take of the case will not require any extended discussion of the matter.

5. To make assurance doubly sure, counsel for Peerless in the argument on appeal was asked again about the waiver of this defense, and repeated that no defense was based upon the fact that the question of bad faith and negligence had not been (and now never could be) judicially determined.

sion with Arms' automobile; to defend any suit against Yeatts with respect thereto, "even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;" and to "pay all expenses incurred by" Inland.

Article III of the reinsurance treaty provides, in part, that:

> "The actual payment by the Company [Inland] of any loss shall be a condition precedent to any recovery under this Agreement, and subject to such condition, *the liability of the Reinsurer [Peerless] shall follow that of the Company in every case * * *.*" (Emphasis supplied.)

Since the obligation of Inland was to defend any suit against Yeatts, and it had the right to investigate, negotiate and settle any claim or suit, and as the liability of Peerless followed that of Inland in every case, upon actual payment of loss by Inland, the question is whether or not the payment by Inland of $27,500 and expenses in the Yeatts v. Inland suit, was a loss or expense of Inland under its policy insuring Yeatts.

The parties claim, and the district court agreed, that the question whether Peerless is liable under the facts in this suit, is one of first impression. Peerless in denying liability relies primarily upon (a) inferences which it seeks to have drawn from an article in 67 Harvard Law Review 1136, 1150, Keeton, Liability Insurance and Responsibility for Settlement; (b) the contention that the decision not to settle (or endeavor to settle) for the policy limits plus the amount the insured was ready and willing to contribute was the decision of Pickett, the agent solely of Inland; and (c) that Peerless and Inland were not co-adventurers or co-principals but that responsibility for defense, investigation, negotiation and settlement was vested exclusively in Inland, Peerless being obligated only, in any event, to pay $10,000 plus its proportionate share of expenses. Inland insists that the provision that the liability of Peer-

less shall follow that of Inland in every case, is applicable to the facts in question; and in support thereof cites an address by the Vice President of American Mutual Reinsurance Company, who is also an attorney, at the annual meeting of the Insurance Section of the American Bar Association in Dallas, Texas, in 1956.

In the Keeton article it is suggested that the question of liability of the reinsurance carrier in excess of the stated amount ceded is dependent upon whether the control of the "settlement decision" is with the "contract company" or with the reinsurer.

As to the status of Pickett, it is clear that he was selected by Inland, but Peerless never at any time objected. Peerless recognizes its obligation to pay two-thirds of his fee charged to and paid by Inland, which included his services in the Arms-Yeatts litigation, including investigation, trial and presumably settlement negotiations; nor did Peerless seek to exercise its rights "to be associated with the Company * * * in the defense or control of any claim or suit or proceeding * * *" by appointment of its own counsel (which it had done in other cases arising under the reinsurance treaty).

Inland's position is supported by the following portion of the address at the 1956 Dallas meeting:

> "Next, assuming that the policy limits are sufficient to exceed the reinsured's retention and the matter has been adequately reported to the reinsurer and it has agreed with the reinsured to reject the claimant's offer to settle for an amount within the policy limits (and perhaps even within the reinsured's retention), then I believe that the reinsurer by reason of its acquiescence in the defense strategy, has become a party to the reinsured's negligence or bad faith, or both, in the defense of the claim even though not actively engaged in the defense. It stood to profit by successful defense, and for the same reason should stand to lose

by the adverse outcome, and should thereby indemnify the reinsured accordingly, or be estopped from denying liability under its contract of indemnification."

In this case, Inland had no [6] interest in persuading Peerless not to settle within the policy limits. The $7,500 offer exhausted Inland's retention of $5,000. In fact, the settlement of the Arms claim for $15,000 would have been more advantageous financially to Inland than would settlement of the claim for $7,500. Expenses were to be apportioned between Inland and Peerless "in proportion to the respective interests as finally determined." Therefore, in a $7,500 settlement, Inland would bear two-thirds of the expenses of defense, investigation, negotiation and settlement. If the case had been settled for $15,000 (plus the insured's contribution) Inland would have paid only one-third of such expenses, and Peerless would have borne two-thirds. There was therefore no occasion for Inland, for ulterior reasons, to have attempted to mislead Peerless, or to refuse to settle within the policy limits.

Therefore, we are not here concerned with, and hence express no opinion as to, what might have been the rights, obligations and liabilities of Inland and Peerless inter sese if Inland had held back from Peerless any significant information, or if Inland had refused to settle within the policy limits without consulting Peerless, or if Peerless had recommended settlement within the policy limits, and Inland had refused.

Our holding is that, under the facts of this case, where Peerless knew as much about the Arms case as did Inland; where Peerless' appreciation of the risks was different from and sounder than Inland's; where Inland had already committed itself to $5,000, the

risk retained by it, and stood to gain rather than lose by a settlement within the policy limits; and where Peerless was freely and frankly consulted by Inland, and Peerless left the decision in Inland's hands, that decision became the decision of Peerless as well as Inland; Peerless is bound along with Inland by that decision whether sound or unsound, favorable or unfavorable; and that as the liability of Peerless "shall follow that of" Inland, Peerless is liable for two-thirds of the cost to Inland of a concededly proper settlement of the Yeatts-Inland litigation. In defending the action against Yeatts, the companies were unquestionably engaged in a joint enterprise (Chisholm v. Gilmer, 4 Cir., 1936, 81 F.2d 120, 124), the losses arising from which should be borne in accordance with their respective interests in the enterprise.

The judgment of the district court accordingly is affirmed, with costs to the appellee.

Affirmed.

---

6. Under the reinsurance treaty, Inland would be entitled to receive a fifteen percent contingent commission on net profits accruing to Peerless on business covered by the reinsurance treaty.

The district court correctly found that Peerless had introduced no evidence that a saving of $7,500 on this particular account would have resulted in any commission to Inland, since accountings were on an annual experience basis, with provision for subsequent adjustments.