COMMERCIAL UNION
INSURANCE COMPANY

v.

PITTSBURGH CORNING CORPORA-TION, PPG Industries, Inc., Corning Glass Works, the Travelers Indemnity Company, Insurance Company of North America, American Motorists Insurance Company, Lumbermens Mutual Casualty Company.

Appeal of The TRAVELERS INDEMNI-TY COMPANY, in No. 85–1450.

Appeal of PITTSBURGH CORNING CORP., in No. 85–1486.

Nos. 85–1450, 85–1486.

United States Court of Appeals, Third Circuit.

Argued March 3, 1986.

Decided April 29, 1986.

Rehearing and Rehearing In Banc Denied May 28, 1986.

Richard M. Shusterman, David E. Sandel, Jr., Peter J. Mooney, White and Williams, Philadelphia, Pa., for amicus curiae, Ins. Co. of North America.

Donald E. Seymour, Peter J. Kalis, Carolyn M. Branthoover, Lorraine A. Mansour, Kirkpatrick & Lockhart, Pittsburgh, Pa., for amicus curiae, H.K. Porter Co., Inc.

Frank H. Griffin, III, Dechert, Price & Rhoads, Philadelphia, Pa., for amicus curiae, ACandS, Inc.

Jerold Oshinsky, Anderson, Baker, Kill & Olick, Washington, D.C., for amicus curiae, Abex Corp.

Dennis G. Jacobs (argued), Barry R. Ostrager, David T. Eames, Seth A. Ribner, Simpson Thacher & Bartlett, New York City, George A. McKeon, Gen. Counsel, James K. Killelea, Thomas L. Forsyth, The Travelers Ins. Companies, Hartford, Conn., Duane, Morris & Heckscher, Philadelphia, Pa., for appellant, The Travelers Indem. Co.

Douglas E. Cameron, John McN. Cramer, James J. Restivo, Jr. (argued), Laurence E. Flately, Michael J. Betts, Pasquale D. Gentile, Jr., Reed Smith Shaw & McClay, Pittsburgh, Pa., for cross-appellant Pittsburgh Corning Corp.

James Lewis Griffith (argued), Michael F. DeMarco, Griffith & Burr, Philadelphia, Pa., for appellees, Commercial Union Ins. Co.

David J. Armstrong, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for appellee, PPG Industries, Inc.

Before ALDISERT, Chief Judge and SEITZ and ADAMS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

We are required to consider two appeals from the final judgment of the district court dated July 1, 1985. The judgment was entered in a declaratory judgment action initiated by Commercial Union Insurance Company (CU)[1] against several defendants under the Court's diversity jurisdiction. These appeals involve disputes between two of the defendants to that action.

The primary appeal (85–1450) is by defendant The Travelers Indemnity Company (Travelers). The second and so-called cross-appeal (85–1486) by defendant Pittsburgh Corning Corporation (PC or Pittsburgh Corning) was admittedly taken to assert an alternative ground for summary judgment in its favor in the event the basis for reversal relied upon by appellant Travelers is found to be meritorious.[2] The other named defendants are not parties to these appeals.

### I.

### A.

Between 1962 and 1972, Pittsburgh Corning manufactured and sold a product called

---

1. Commercial Union wrote excess liability insurance for Pittsburgh Corning and supports Travelers position on appeal.

2. PC's notice of appeal also is addressed to the district court's order dated November 2, 1981. We think the subject matter of that order is subsumed by the final judgment.

Unibestos, a thermal pipe-insulating material with an asbestos ingredient. Since 1975, many thousands of lawsuits have been brought against Pittsburgh Corning alleging injury and death resulting from exposure to Unibestos. From July 1, 1962 to July 1, 1970, Travelers furnished primary comprehensive general liability (CGL) insurance coverage to Pittsburgh Corning. Those policies extended PC one million dollars each year in indemnity for products liability claims, for a total coverage of eight million dollars. The policies were standard CGL forms prepared by an insurance industry advisory group, although each policy included numerous riders and amendments.

All of the Travelers policies promised both to indemnify and to defend the insured. The policies covering the four years ending July 1, 1966 (the pre-1966 policies), the only ones at issue in this case, promised to indemnify the insured for all liability due to personal injury up to the policy limit, and also

[w]ith respect to such insurance as is afforded by this policy, [to] ...

(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim as it deems expedient;

.    .    .    .    .

and the amounts so incurred, except settlements of claims or suits, are payable by the company in addition to the applicable limit of liability of this policy.

From 1976 on, Travelers defended asbestos-related claims against PC pursuant to its policies and to other agreements among PC's primary carriers. One such agreement executed in 1976, entitled an Agreement for the Defense and Settlement of Asbestosis Claims (the 1976 Intercompany Agreement), provided that the costs of indemnification and defense of asbestosis claims against PC would "be borne solely by Travelers (consistent with all the terms and conditions of Travelers policy(s))," except that costs could be allocated to the other parties consistent with the terms of their respective policies. It also provided:

This agreement will expire on January 1, 1979. Any claims or suits pending as of that date will continue to be handled in accordance with the terms of this agreement, to conclusion.

On June 24, 1981, Travelers advised PC that it had exhausted the limits of its liability and after July 1 would no longer defend any claims, including claims then pending. The defense of those claims was subsequently assumed by CU under a reservation of rights.[3]

## B.

CU initiated this action in 1981 seeking a declaration of its rights and responsibilities with respect to defending asbestos-related claims against PC. Defendants PC and Travelers counterclaimed, and PC cross-claimed against Travelers.

On cross-motions for partial summary judgment, the district court entered an order dated October 29, 1981, supplemented by a memorandum opinion reported at 553 F.Supp. 425, granting PC's motions for partial summary judgment against CU and Travelers. The court held, insofar as here pertinent, that under the terms of the pre-1966 policies and Pennsylvania law, Travelers owed a continuing duty to PC to defend claims against it after exhaustion of its policy limits. The court rejected, however, PC's argument that Travelers had a duty to PC under the 1976 Intercompany Agreement to defend to conclusion actions pending as of January 1, 1979. Id. at 432.

In a later order, filed on May 16, 1985, the court clarified and extended its 1981 order. *Commercial Union Insurance Co. v. Pittsburgh Corning Corp.*, 609 F.Supp.

---

**3.** We were informed at oral argument that CU's coverage, too, has been exhausted, and that it is no longer handling any claims for PC.

685 (E.D.Pa.1985). The court indicated that its 1981 order had only held that Travelers must continue to defend only lawsuits pending at the time its policy limits were exceeded. This interlocutory ruling is incorporated into the final judgment dated July 1, 1985.

## II.

■ Travelers argues on appeal that the district court erred in holding that it had a duty to defend asbestos related actions against Pittsburgh Corning once the indemnification limits of its policies were reached by satisfaction of judgments or settlements. Our task is to decide whether the district court properly predicted how the Supreme Court of Pennsylvania would interpret the insurance policies at issue. Under Pennsylvania law, which the parties agree is controlling, we look initially to the language of the policies. If the language is unambiguous, its interpretation is a question of law, and our review is plenary. Whether the language is ambiguous is likewise a question of law. *Pacific Indemnity Co. v. Linn,* 766 F.2d 754, 760 (3d Cir. 1985).

Travelers argues that the language of the pre-1966 policies unambiguously indicates that its duty to defend entirely terminates upon exhaustion of its policy limits.[4] It relies principally on two phrases in the policies: *"With respect to such insurance as is afforded by this policy,* the company shall ... defend any suit against the insured...."; and the statement that Travelers' promises are made *"subject to the limits of liability,* exclusions, conditions and other terms of this policy ..." (emphasis added).

The district court held that the policy language could reasonably be construed to mean either that the duty to defend ceases when the duty to indemnify ends (as Travelers contends), or that "the insurer must defend 'any suit' which might give rise to the type of liability to which the policy is directed." 553 F.Supp. at 429. The court buttressed its conclusion by pointing to the insurance industry's redrafting of its standard CGL policy in 1966, and to Travelers internal memoranda indicating that the pre-1966 policies could be read to require a continuing duty to defend. The court then held that under Pennsylvania law any ambiguity is to be construed in favor of coverage. As noted above, however, the court did not extend Travelers' duty to defend to actions brought after its policy limits were exhausted.

In determining whether the policies at issue are ambiguous, we are guided by our recent decision in *ACandS, Inc. v. Aetna Cas. & Sur. Co.,* 764 F.2d 968 (3d Cir.1985), construing policy language identical in relevant respects to that here. There we interpreted the phrase "[w]ith respect to such insurance as is afforded" to mean that "[i]f, at the outset of a particular action, it is properly established that the insurer cannot possibly be liable for indemnification because policy limits have been exhausted, then the policy language does not impose a duty to defend that action under Pennsylvania law." Id. at 975. In reaching this result, we relied on the decision of the Pennsylvania Supreme Court in *Wilson v. Maryland Cas. Co.,* 377 Pa. 588, 105 A.2d 304 (1954), which held that similar policy language did not impose a duty to defend a claim for which the insurer would not be required to provide indemnification even if the claim were successful. Although we recognized that the claim in *Wilson* was outside the policy's coverage because it was of a *type* of claim not covered rather than because the action was brought after the policy's indemnification limits had been reached, we indicated that "this distinction is of no consequence." Id.

*ACandS* expressly left open the precise question in this case—"whether ... an in-

---

**4.** Travelers conceded at oral argument that the insurer may not abruptly withdraw from the defense of a pending case if the manner of its withdrawal could prejudice the insured. The district court concluded that "[t]he affidavits make clear that the insurer has offered to transfer the defense in an orderly manner," 553 F.Supp. at 425, and PC does not contend otherwise on appeal. Thus, the manner in which the insurer may withdraw is not before us.

surer may terminate its defense of a claim in 'mid-course.'" Id. But the rationale of that case, and of other cases construing Pennsylvania insurance law, persuades us that the answer to that question can only be yes. Indeed, we quoted *Wilson* for the proposition that "the insurer 'is not required to defend if it would not be bound to indemnify even though the claim against [the insured] should prevail.'" Id. (quoting *Wilson*, 377 Pa. at 594, 105 A.2d at 307; bracketed material added by *ACandS* court). The principle that the duty to defend is linked to the duty to indemnify,[5] and consequently that, absent other considerations, the insurer is not bound to defend where it cannot be bound to indemnify, applies regardless of when the duty to indemnify comes to an end.

There is no principle of Pennsylvania law that the duty to defend automatically "attaches" at the outset of the litigation and cannot afterwards terminate. Nor, indeed, is there any language in the policies suggesting that the moment of filing has such significance. Pennsylvania courts, as well as federal courts construing that state's law, have often stated that "once a third party has raised allegations against an insured which potentially fall within the coverage provided, the insurer is obligated to fully defend its insured *until it can confine the possibility of recovery to claims outside the coverage of the policy*." *American Contract Bridge League v. Nationwide Mut. Fire Ins. Co.*, 752 F.2d 71, 75 (3d Cir.1985) (emphasis added); *see also, e.g., Cadwallader v. New Amsterdam Cas. Co.*, 396 Pa. 582, 152 A.2d 484, 489 (1959) (same, quoting *Lee v. Aetna Cas. and Sur.*

*Co.*, 178 F.2d 750, 753 (2d Cir.1949) (L. Hand, C.J.)); *accord Upper Columbia R. Towing Co. v. Maryland Cas. Co.*, 313 F.2d 702, 707 (9th Cir.1963) (holding, apparently under Oregon law, that the insurer may withdraw from a case "upon determining that there was no coverage under the policy" if it can do so in a manner that does not prejudice the insured).

It is true that these cases involved types of coverage rather than amounts. But as we indicated in *ACandS*, "this distinction is of no consequence." 764 F.2d at 975. Nothing in the language of the policies suggests that this distinction is of critical significance in the present context; rather, the policies speak generally of "insurance ... afforded by this policy," which appears to encompass both types and amounts of coverage. PC's theory that the cited cases involve a "conditional" duty to defend is ingenious but insupportable. If its theory were correct, that "conditional" duty would attach only where it was impossible to tell from the complaint whether or not the claim fell within the policy coverage. But as the quoted language from *American Contract Bridge League* should make clear, the insurer is equally entitled to withdraw when a claim clearly within the policy coverage is withdrawn and one outside the policy coverage remains. *See also Harborside Refrig. Serv. v. IARW Ins. Co.*, 759 F.2d 829, 831 (11th Cir.1985) (holding that the insurer "is responsible for the entire defense *until the covered claim is dropped from the action*"; emphasis added). This result stems not, as PC argues, from the vagaries of notice pleading, but from the principle that, absent policy lan-

---

5. We stress that the linkage between the duty to defend and the duty to indemnify is a creature of contract, not a general principle of law. Thus, some of the cases relied on by Pittsburgh Corning are simply inapplicable because the language of the policies in those cases varied from the language of the policies here. In *Weinberg v. State Workmen's Insurance Fund*, 368 Pa. 76, 81 A.2d 906 (1951), for example, the court held that the duty to defend existed although the suit against the insured was not within the coverage of the indemnification provision. But the policy in that case did not limit the promise to defend to "such insurance as is

afforded" by the indemnification provisions. Id., 81 A.2d at 909. Instead, the insurer there agreed "[t]o defend *any* suits or proceedings alleging such injuries" as are compensable under the Workmen's Compensation laws. Id. (emphasis in original). The court held, therefore, that the insurer was required to defend a workmen's compensation action in New Jersey although it was only required to indemnify the insured for recoveries under the Pennsylvania act. A similar analysis of the policy language explains *Zeitz v. Zurich Gen. Accident and Liab. Ins. Co.*, 165 Pa.Super. 295, 67 A.2d 742 (1949).

guage to the contrary, the insurer is not liable to defend if it will not be liable to indemnify. The reason for its nonliability is immaterial.

Interpreting the policy in this manner also leads to the most reasonable allocation of defense responsibilities. A carrier that is obligated to pay for both defense and indemnification has an incentive to minimize its total liability, and thus the total costs arising from a claim. By contrast, severing the duty to defend from the duty to indemnify creates a serious conflict of interest, with one carrier wishing to minimize litigation costs and the other intent on litigating even marginally contestable claims. This conflict is acute regardless of which carrier has actual control of the defense; it is likely to be especially severe, however, where the insurer with the duty to defend has the right to negotiate and settle claims, as PC's counsel appeared to concede at oral argument was the case here. We find it unlikely that the parties contemplated such a result.

PC does not deny that the conflict of interest described is likely. It contends, however, that it is common in the insurance industry for one carrier to defend claims as to which it has no obligation to indemnify. But in most of the cases it cites—for example, liability policies with deductibles to be paid by the insured—the insurer handling the claims does so at least in part for its own account. We may also take notice that reinsurance contracts (also cited by PC in this regard) often give both the ceding company and the reinsurer the right to participate in defending a claim. See, e.g., the policies quoted in *Reid v. Ruffin*, 503 Pa. 458, 469 A.2d 1030, 1032 (1983); *Peerless Ins. Co. v. Inland Mutual Ins. Co.*, 251 F.2d 696, 697 (4th Cir.1958). Indeed, the policy at issue in *Reid* also gave the reinsurer the right to veto proposed settlements. Thus, it appears that the conflict of interest we have described is one the insurance industry takes pains to avoid. We are therefore not prepared, absent ex-

plicit language to the contrary, to interpret the present contract to create such a conflict.

Pittsburgh Corning relies, as did the district court, on *Anchor Cas. Co. v. McCaleb*, 178 F.2d 322, 325 (5th Cir.1949), and cases following it.[6] In *McCaleb*, however, the court held only that the insurer could not avoid its obligation to defend by paying the full amount of its indemnity into court. This principle is not at odds with the principle adopted here that an insurer may withdraw from defending the insured once its liability limits are reached by judgment or settlement after the insurer had defended the claims in good faith. Indeed, in *Lumbermen's Mutual Cas. Co. v. McCarthy*, 90 N.H. 320, 8 A.2d 750 (1939), which the district court interpreted as contrary to *McCaleb*, the court—after holding that the insurer was not obliged to defend a claim after its liability limits were reached—went on to state in dictum that "[t]his does not necessarily mean that the insurer may elect to pay the full limit of its coverage to the insured and thereby cast upon his shoulders the full burden of investigation, settlement, or defense from the beginning." Id., 8 A.2d at 752.

Most of the other cases cited by PC involve an effort by the insurer to avoid its defense obligation by tendering the policy amount to the insured or the court, and are thus inapposite. Although a few such cases do appear to hold that the insurer is required to defend the insured even after exhaustion of coverage through settlement or judgment, e.g., *St. Paul Fire & Marine Ins. Co. v. Thompson*, 150 Mont. 182, 433 P.2d 795 (1967), the predominant weight of authority is to the contrary. We predict that Pennsylvania would follow the majority view in interpreting policy language such as is here involved.

PC contends, however, that we should find an ambiguity in the policies because certain internal memoranda and other documents prepared by Travelers employees "concede" the existence of such an ambi-

---

**6.** Of these cases, only *Simmons v. Jeffords*, 260 F.Supp. 641 (E.D.Pa.1966), interprets Pennsylvania law, and the discussion of this issue there is dictum.

guity. Even assuming the relevance of this evidence, we find no such concession in these documents. For example, a Travelers Underwriting Guide, dated 1975, appears to apply to *post*-1966 policies. Another memorandum merely notes that some courts interpreted the defense agreement in the pre-1966 policies to be independent of the agreement to indemnify. App. 3485.

In any event, these documents indicate at most that some Travelers employees, writing many years after the policies were drafted and issued, thought them ambiguous. The documents are not contemporaneous evidence of Travelers' intent, nor do they demonstrate that "it would be irrational to give seemingly plain contract terms their apparent meaning." *Northbrook Ins. Co. v. Kuljian Corp.*, 690 F.2d 368, 372 n. 5 (3d Cir.1982); *cf. Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011–12 (3d Cir.1980). Thus, in our view, they do not, as a matter of Pennsylvania law, support the view that the language of these policies is ambiguous.

In light of what has been said, the fact that the standard CGL policy was amended in 1966 does not cast doubt on the clarity of the pre-1966 policy language. The post-1966 policies state that the insurer is not liable to defend any claims "after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements." The district court evidently viewed the act of adopting this provision as an implicit acknowledgement that the pre-1966 policies might reasonably be interpreted not to contain any such limit on the duty to defend. Whether the new language was primarily intended to clarify the limits on the duty to defend might be disputed; another court has held that the new provision was intended only to prohibit the insurer from tendering the policy limits to the court and thereby avoiding its defense duty. *Keene Corp. v. Insurance Co. of North America*, 597 F.Supp. 946 (D.D.C. 1984), *vacated as moot*, 631 F.Supp. 34 (D.D.C.1985). In any event, however, we think that this amendment merely makes even more explicit the extent of an insurers

obligation in the context of its contractual duty to defend.

We conclude, therefore, that the pre-1966 Travelers policies do not oblige Travelers to assume the costs of defending actions against its insured after its duty to indemnify has terminated by the payment of judgments or settlements and it has made an orderly withdrawal from the insured's defense.

### III.

■ In its appeal in No. 85–1486, Pittsburgh Corning contends that Travelers is nevertheless required by virtue of the 1976 Intercompany Agreement to defend to conclusion all asbestos-related claims pending as of January 1, 1979, the expiration date of that agreement. It contends that this duty exists independently of any obligation Travelers may have under its policies. Although it is not a party to the agreement, PC argues that it is entitled to enforce the agreement as an intended beneficiary.

The district court held that PC was merely an incidental beneficiary of the agreement and therefore acquired no rights under it. 553 F.Supp. at 432 (citing Restatement (Second) of Contracts, § 302 (1981), *adopted in Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744 (1983)). The court noted that the express purpose of the contract was only to benefit the carriers by "avoid[ing] intercompany conflicts regarding handling of asbestosis claims for Pittsburgh Corning."

We agree with the district court that PC's contention must be rejected, although for a somewhat different reason. It could hardly be clearer that the contract was intended only to provide a procedural mechanism for handling claims already covered under existing policies, not to extend coverage where there had been none before. Thus, the agreement begins by listing each of the policies under which the parties provided coverage for PC, and the term period of each policy. It then establishes a procedure whereby initial responsibility for claims management will be handled by

Travelers. Indemnification and defense costs are to be borne by Travelers "(consistent with all the terms and conditions of the Travelers policy(s))," but the agreement provides a mechanism for allocating those costs to the other carriers pursuant to their respective policies, and for resolving disputes among the parties. Finally, the agreement indicates that cases pending as of its termination date "will continue to be handled *in accordance with this agreement,* to conclusion" (emphasis added).

The agreement therefore merely supplies procedures for carrying out responsibilities already in existence by virtue of the policies. Indeed, if PC were correct in its interpretation that the agreement obliges Travelers to defend claims regardless of the terms of Travelers' policies, it would be equally true that PC would be entitled to *indemnification* under the agreement beyond the policy limits, at least where the other primary insurers had also exhausted their policy limits. This would follow because the same provisions of the agreement requiring Travelers to pay defense costs also oblige it to pay "[t]he amount of settlement of any claims—or the amount of any judgment against the insured." We are unwilling to adopt an interpretation so clearly at odds with the language, structure, and express purpose of the agreement.

We hold, therefore, in agreement with the district court, that the Intercompany Agreement does not oblige Travelers to assume the costs of defending any claims against PC that it was not already obliged to assume under its insurance policies.

## IV.

As to Appeal No. 85–1450 by Travelers, we will reverse the final judgment of the district court dated July 1, 1985, to the extent that it imposed a duty on Travelers to continue to defend asbestos related actions after it had reached the indemnification limits of its policies, subject to its duty to provide for an orderly transition.

As to Appeal No. 85–1486 by Pittsburgh Corning, the orders dated November 2, 1981 and July 1, 1985, to the extent they determined that the 1976 Intercompany Agreement is inapplicable to Travelers' duty to defend, will be affirmed.