392 A.2d 738

SEABOARD INDUSTRIES, INC., Appellant

v.

Albert B. MONACO, Defendant

and

Continental Casualty Co. and Insurance Company of North America, Appellees.

Superior Court of Pennsylvania.

Argued Dec. 8, 1977.

Decided Oct. 20, 1978.

Bernard J. Smolens, Philadelphia, with him Dennis R. Suplee, Philadelphia, for appellant.

No appearance entered nor brief submitted for appellee, Monaco.

Dudley Hughes, Philadelphia, for appellee, Continental Cas. Co.

Richard W. Hopkins, Philadelphia, for appellee, Ins. Co. of North America.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that the lower court erred in dissolving appellant's writs of execution against appellee insurers because appellees breached their duty to defend the insured.[1] We disagree and, therefore, affirm the lower court.

This appeal arises from a garnishment proceeding in which appellant, Seaboard Industries, Inc. ("Seaboard"), a judgment creditor of Albert B. Monaco, caused writs of execution in attachment to be issued and named as garnishees Continental Casualty Company ("Continental") and Insurance Company of North America ("I.N.A."), appellees in the instant case. The complex factual background giving rise to the instant attachment proceedings is summarized in *Seaboard Industries, Inc. v. Monaco*, 442 Pa. 256, 276 A.2d 305 (1971):

" . . . Seaboard Industries, Inc. is a closely held Pennsylvania corporation. . . . Albert B. Monaco, served as

---

1. Appellant also contends that the lower court erred in finding that appellee insurers were relieved of liability because (1) a previous adjudication of no fraud precluded appellees from relitigating the issue of fraud as a defense to justify appellees' refusal to defend their insured, (2) the insurance policies in question covered the insured's acts both prior to and during the effective dates of the policy, and (3) the insured's activities in relation to Seaboard constituted professional services within the meaning of a professional liability policy. Because we conclude that appellees had no duty to defend the insured, we find it unnecessary to evaluate appellant's other contentions. We note, however, that the lower court's opinion by MARUTANI, J. presents a comprehensive, extended analysis of these claims and finds them meritless. Moreover, the lower court's opinion provides a detailed factual description of the insured's activities in relation to Seaboard and amply supports its findings that those activities were fraudulent.

the Secretary of Seaboard from June 1963, until February 12, 1964, and was retained as legal counsel for Seaboard from its incorporation in September, 1962, until June, 1965.

"On May 25, 1963, Seaboard entered into a written assignment of lease agreement whereby Seaboard acquired the rights to mine, reclaim and remove coal from certain deposits owned by the Blue Ridge Real Estate Company. Thereafter, in September Seaboard and Blue Ridge entered into a lease directly between themselves under which Seaboard was entitled to the same rights, and was to pay Blue Ridge a royalty of 35 cents a ton. The lease was predated May 27, 1963, and was to run for ten years.

"Seaboard commenced to reclaim and mine the coal in June, 1963. At that time, John D. Howley was the president. He continued in office until July, 1963, when Walter F. Joachim assumed control and management of Seaboard. Prior to Joachim's becoming president and treasurer, Seaboard's operations had been profitable.

"On November 19, 1963, Joachim met with Blue Ridge and stated that the installation of a coal preparation plant at the deposit site was necessary to render the mining and reclamation operation profitable. He also said that a proposal would be submitted to Blue Ridge involving the anticipated change in operations either on the basis of a new royalty fee or else the outright purchase of the coal deposits by *Joachim.*

"Later the same day, a Seaboard shareholders' meeting was held. Although Joachim advised those present that he had been in contact with two of the larger coal producers in the eastern United States, Pagnotti Coal Interests, Inc. and Correale Mining Company, concerning the possibility of erecting a coal processing plant on the land where Seaboard was mining, he made no mention of the negotiations earlier in the day with Blue Ridge. Monaco attended the meeting and, as he had assumed the office of Secretary of the corporation, recorded the minutes. The three other shareholders, comprising seventy-five percent of the voting stock, instructed Joachim to enter into negotiations with Pagnotti for the construction of a plant.

"On December 2, 1963, Joachim, with the knowledge and consent of Monaco, submitted to Blue Ridge a written offer to purchase on his own behalf Blue Ridge's interest in the same coal and refuse deposits that were the subject of the May 27, 1963 lease between Blue Ridge and Seaboard. On December 27, 1963, Blue Ridge delivered its letter of intention to sell to Joachim.

"Another Seaboard shareholders' meeting was held on January 2, 1964. Although both Monaco and Joachim knew of Blue Ridge's letter of intention, neither informed any of the other shareholders and directors of its existence.

"On January 29, 1964, Monaco assisted Joachim in terminating the lease between Blue Ridge and Seaboard and purchasing the coal banks for Joachim individually.

"Prior to that time, Joachim and Pagnotti had negotiated concerning the construction of the plant, and Pagnotti had orally agreed to erect the plant and pay *Joachim* a royalty of at least $1.00 per ton. On February 10, 1964, Joachim subleased the right to mine the land to Pagnotti for a royalty of $1.40 per gross ton. Monaco again assisted Joachim with these arrangements.

"The next Seaboard shareholders' meeting was held on February 12, 1964. Monaco and Joachim each communicated that they had carried out the instructions received at the November meeting. They stated that Pagnotti was paying a royalty of $1.00 per gross ton, rather than the actual amount of $1.40. They also indicated that instead of paying the entire royalty directly, Pagnotti would pay $.65 per ton to Seaboard and $.35 per ton would be paid to the "owner" of the coal deposits.

"At the same meeting Monaco displayed an 'agreement' which he had prepared purporting to be a contract between Pagnotti and Seaboard concerning the installation of the plant and the mining of the coal. In actuality, the writing was not a legal agreement, and Seaboard acquired no rights in exchange for the execution of the writing.

"Earlier the same day, Monaco had received from Joachim an assignment of $.10 per gross ton of all commercial coal produced from the Blue Ridge deposits then owned by Joachim. Presumably this assignment was a reward for Monaco's services to Joachim in perpetrating the seizure and exploitation of Seaboard's above described corporate opportunity to purchase the Blue Ridge coal banks.

"Shortly after February 12, 1964, Monaco billed and received from Seaboard $7,500 for legal services allegedly rendered to Seaboard in connection with all the negotiations between Pagnotti and Seaboard, when in actuality the negotiations had been between Joachim, Blue Ridge, and Pagnotti. However, the chancellor allowed this fee.

"In 1965, Joachim leased the mining rights to Correale, and Monaco received approximately $900 per month in royalties after February, 1966. Moanco also assisted Joachim in obtaining the loan necessary to pay Blue Ridge for the purchase of the coal banks. In fact, Monaco borrowed $18,000 in his own name and turned these funds over to Joachim." 442 Pa. at 258–261, 276 A.2d 307–308 (Emphasis in the original).

In 1965, Seaboard brought a suit in equity against Walter F. Joachim in the Philadelphia County Court of Common Pleas in which Seaboard sought a transfer of the coal banks held by Joachim as well as money damages. On May 8, 1967, Seaboard also filed a complaint in equity against Albert Monaco in which Seaboard sought, *inter alia*, an order declaring Monaco to be a constructive trustee in favor of Seaboard and money damages. Monaco forwarded Seaboard's complaint to Continental and I.N.A. on May 22, 1967. On August 8, 1967, the insurers notified Monaco by letter of their refusal to defend him because the policy did not cover the allegations contained in the complaint. On November 6, 1967, by stipulation between counsel for Seaboard and counsel for Monaco, Seaboard amended Paragraphs 126 and 129 of its complaint to allege negligence. Notice of this amendment was not given to Continental until October 8, 1969.

After trial, the lower court entered a decree nisi and filed an adjudication in which it found that both Joachim and Monaco had breached their duties of loyalty and faithfulness to Seaboard. *Seaboard Industries, Inc. v. Joachim*, 45 D. & C.2d 780 (1968). The trial court *en banc* affirmed the adjudication on December 10, 1968; judgment was entered against Joachim and Monaco in the amount of $207,125.00 on September 9, 1969. The Supreme Court subsequently affirmed the lower court's decree. *Seaboard Industries, Inc. v. Monaco*, supra.

In 1969, Seaboard instituted garnishment proceedings against Continental and I.N.A. in the Philadelphia County Court of Common Pleas on the basis of liability insurance policies which the insurers had issued to Monaco.[2] Continental had issued to Monaco an attorney's professional liability policy in the amount of $100,000.00; I.N.A. had issued to Monaco a personal catastrophe policy in the amount of $1,000,000.00. Both policies designated Monaco as the named insured and provided coverage for policy periods beginning October 5, 1964, and expiring on October 5, 1967. The pertinent portions of Continental's policy provided as follows:

"*Coverage* : To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed upon him by law for damages resulting from any claim made against the insured arising out of the performance of professional services for others in the in-

[2]. On April 11, 1973, the lower court consolidated the suit of *Seaboard Industries, Inc. v. Continental Casualty Company and Insurance Company of North America* as Garnishees with the suit of *Albert B. Monaco v. Continental Casualty Company and Insurance Company of North America*.

On July 24, 1973, Seaboard and Albert Monaco entered into a stipulated agreement in which the parties agreed that Monaco would pay Seaboard the sum of $25,000.00 which Seaboard would credit against any judgments, orders, and decrees entered against Monaco in Seaboard's suit against Monaco. Monaco also agreed to assign and transfer to Seaboard any rights and claims he had against Continental and I.N.A. arising out of Monaco's professional liability policies to the extent of the unpaid balance of any judgments, orders, and decrees against Monaco. Seaboard agreed to dissolve attachments and garnishment proceedings against Monaco.

sured's capacity as a lawyer or a notary public and caused by any act, error or omission of the insured or any other person for whose acts the insured is legally liable.

"*Exclusions* : This policy does not apply (a) to any dishonest, fraudulent, criminal or malicious act or omission of the insured, any partner or employee; . . . ." Further, under Article IV, entitled "Policy period, Territory", the policy provided:

"This policy applies only to acts, errors or omissions which occur . . . (a) during the policy period . . . or (b) prior to the effective date of the policy and then only if claim is made or suit is brought during the policy period provided (1) no insured had any knowledge at the effective date of the policy of such prior act, error or omission, . . ."

The I.N.A. coverage extended to "damages arising out of the performance of professional services for others in the named insured's capacity as a lawyer and caused by the named insured or any other person for whose acts the named insured is legally liable." Article I–(b). The provision regarding "EXCLUSIONS" stated: "This policy shall not apply, as respects Coverage I–(b): . . . (h) to any claim for loss or expense for which insurance is not afforded by the underlying professional liability policy(ies) . . . ." In addition under 'CONDITIONS' there is included a provision reading: 'This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying policy(ies) or insurance.' "

The I.N.A. policy further provided: "As respects Coverage I(b), this policy applies . . . to professional services performed for others (a) during the policy period or (b) prior to the effective date of the policy if claim is made or suit is brought during the policy period and provided the named insured or any employee or partner of the named insured . . . had no knowledge or could not have reasonably foreseen any circumstances which might result in a claim or suit at the effective date of the policy." Article V, entitled "Policy Period, Territory".

The parties to the garnishment proceedings agreed to submit the case for determination by the lower court based on the record from the previous litigation and the pleadings and discovery filed in the instant case. On May 6, 1977, the lower court dissolved the writs of execution. This appeal followed.

Appellant contends that appellees breached their duty to defend Monaco pursuant to the insurance policies they had issued. Specifically, appellant maintains that by failing to provide its insured, Monaco, with legal representation, Continental[3] is liable to Monaco for counsel fees and costs. Consequently, appellant seeks to attach this claimed obligation as an asset of Monaco.

We recognize that "the obligation to defend arises whenever the complaint filed by the injured party may *potentially* come within the coverage of the policy." *Gedeon v. State Farm Mutual Automobile Insurance Co.*, 410 Pa. 55, 58, 188 A.2d 320, 321 (1963) (Emphasis in the original). The amount of recovery for breach of the duty to defend is the cost of hiring substitute counsel and the additional defense costs. *Gedeon*, supra; *King v. Automobile Underwriters, Inc.*, 409 Pa. 608, 187 A.2d 584 (1963).

The leading case regarding the duty of an insurer to defend is *Cadwallader v. New Amsterdam Casualty Co.*, 396 Pa. 582, 152 A.2d 484 (1959) in which an attorney sued his professional liability insurance carrier for failure to defend a suit brought against him by a New York attorney. The basis of the suit was that Cadwallader had received monies to be held in escrow and, in violation of the escrow agreement, had paid the monies to his clients without retaining the funds to be paid to the New York attorney. The New York attorney further alleged an unlawful conspiracy and collusive arrangements between Cadwallader and his clients.

3. Seaboard makes no claim against I.N.A. for counsel fees and costs incurred by Monaco. Under "Conditions" of the I.N.A. policy, a clause "excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) . . . ."

Cadwallader forwarded the complaint to his insurance carrier who refused to defend by claiming that the policy excluded intentional misconduct. Our Supreme Court concluded that because of "the plasticity of the modern pleadings," when "the complaint comprehends an injury which may be within the policy, . . . the promise to defend includes it." *Cadwallader*, supra, 396 Pa. 582, at 590, 152 A.2d 484, at 488. *See also Lee v. Aetna Casualty & Surety Co.*, 178 F.2d 750 (2nd Cir. 1949). Because the trial court could have determined that violation of the escrow agreement was based on negligence and not on intentional misconduct, the insurer had breached its duty to defend. Thus, if there are two separate causes of action and one would constitute a claim within the scope of the policy's coverage, the insurer has a duty to defend until it can confine the claim to a recovery excluded from the scope of the policy. *Pittsburgh Plate Glass Co. v. Fidelity and Cas. Co. of New York*, 281 F.2d 538 (3d Cir. 1960); *Bituminous Insurance Co. v. Pennsylvania Manufacturers Ass'n.*, 427 F.Supp. 539 (E.D.Pa. 1976); *Moffat v. Metropolitan Cas. Ins. Co. of New York*, 238 F.Supp. 165 (E.D.Pa.1964); *Gulf Ins. Co. v. Mack Warehouse Corp.*, 212 F.Supp. 39 (E.D.Pa.1962).

In contrast to the result in *Cadwallader*, supra, in *Wilson v. Maryland Cas. Co.*, 377 Pa. 588, 105 A.2d 304 (1954), our Supreme Court found that an insurer had no obligation to defend when the suit against its insured was based on a cause of action excluded from the policy coverage. In *Wilson*, the defendant-insured filed a complaint with his insurer to which he had attached a copy of the plaintiff's complaint alleging only assault and battery. Because the insurance policy expressly excluded liability for intentional injuries, the insurer had no duty to defend. " . . . The obligation of a casualty insurance company to defend an action brought against the insured is to be determined solely by the allegations of the complaint in the action . . . ." *Wilson*, supra at 594, 105 A.2d 304 at 307.

In the instant case, Seaboard's original complaint contained Paragraph 26 charging Monaco as follows:

"25. Monaco, . . ., conceived and formulated a fraudulent and nefarious scheme and plan to defraud and deceived plaintiff and to fraudulently terminate, cancel and otherwise deprive plaintiff of its rights . . ., and conspired and planned to acquire, obtain and usurp such rights and opportunities obtainable or available to plaintiff for the personal gain and benefit of Monaco, Joachim and Joachim, Inc. The aforesaid fraudulent and nefarious conspiracy, scheme and plan is hereinafter referred to as 'Fraudulent Conspiracy' and is more fully set forth hereafter." Thereafter, the complaint referred to the "Fraudulent Conspiracy" allegation defined in Paragraph 26.[4] Moreover, the pleadings in the original complaint continuously repeated Seaboard's charges against Monaco of "fraudulent and nefarious scheme and plan to defraud and deceive [Seaboard]." Finally, Seaboard abbreviated this charge as "Fraudulent Conspiracy" and added it to the many detailed acts it alleged against Monaco. These allegations are clearly within the exclusionary provision of Continental's policy which expressly exempts from coverage "any dishonest, fraudulent, criminal or malicious act or omission." Consequently, the original complaint did not trigger a duty to defend and Continental properly refused coverage.

Appellant contends that Continental's duty to defend at least arose when appellant filed its amended complaint charging Monaco with negligence. However, these amendments do not alter the conclusion that Seaboard's allegations against Monaco are within the exclusionary provision of Continental's policy exempting fraud. First, the amendment itself continues the use of the abbreviated phrase "Fraudulent Conspiracy."[5] Second, notice of the November

4.  See Paragraphs 44, 60, 76, 82, 128, 129, 130, 131, and 132 of Seaboard's complaint.

5.  "Paragraph 125 of the Complaint is hereby amended so as to read as follows:

    "125. During all times that Monaco served as Secretary and Legal Counsel for Seaboard and all times during which Joachim served as President and Director of Seaboard, Seaboard relied upon and expected Monaco and Joachim to fully and completely perform and

6, 1967 amendment was not given to Continental until October 8, 1969, almost two years after the effectuation of the amendment. In *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977), our Supreme Court discussed the role of the notice requirement in insurance policies:

"[A] reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been in had timely notice been provided, e. g., being forced to pay a claim against which it has not had an opportunity to defend effectively. In short, the function of a notice requirement is to protect the insurance company's interests from being prejudiced. . . . We therefore hold that where an insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position." *Brakeman*, supra 472 Pa. at 75, 76, 371 A.2d at 197, 198. In the instant case, if the purpose of the amendment was to add allega-

carry out all duties and obligations which under the law they were obligated to perform, including the obligation to discharge the duties of their position in good faith and with diligence, due care and skill as required by the laws and statutes of this Commonwealth in such cases made and provided, which duties and obligations Monaco and Joachim willfully, intentionally, carelessly, recklessly, imprudently, negligently and in bad faith failed to perform, particularly as set forth in this complaint.

"Paragraph 129 of the Complaint is amended so as to read as follows:

"As a result of the aforesaid fraudulent and wrongful acts of Monaco, including said careless, reckless, imprudent, negligent, and bad faith acts, and said FRAUDULENT CONSPIRACY, Seaboard lost and was deprived of all rights and benefits under or arising out of its Lease Agreement with Blue Ridge and which, *inter alia*, was cancelled and terminated to enable Joachim to enter into the Agreement which is Exhibit "F" hereof, and Seaboard was further deprived of and foreclosed from consideration or exercise of any opportunity to purchase or acquire the right, title and interest of Blue Ridge in and to the coal and refuse deposits which were the subject of said Lease Agreement and those located on the north side of Route 45 and to the rights and benefits which were acquired or obtained by Joachim from Hauto Valley, Pagnotti and Correale all of which rightfully belong to Seaboard."

tions which would potentially bring the claim within the coverage of the policy, *Gedeon*, supra, the amendment was untimely. By the time Continental received notice of the amendment to the complaint, the chancellor had already entered a decree nisi which the lower court *en banc* subsequently had affirmed. Thus, if the late notice of the amendment imposed a duty on Continental to defend, Continental would be placed "in a substantially less favorable position than it would have been in had timely notice been provided . . . ." *Brakeman*, supra 472 Pa. at 75, 371 A.2d at 197.

Seaboard maintains that because Continental erred in refusing to defend Monaco in the initial suit, Seaboard was relieved of the obligation to give Continental timely notice of the amendment to the complaint. However, we have concluded that Continental properly based its refusal to defend Monaco on the original complaint which alleged a cause of action excluded from the policy's coverage, i. e., fraud. If the amendment to the complaint alleged a new cause of action requiring Continental to defend, the insured was obliged to give Continental timely notice of that amendment so that Continental could evaluate a newly alleged duty to defend. Moreover, Seaboard had an obligation to make certain that Continental received the requisite notice in order for Seaboard to preserve any claim it may have had against Continental. Accordingly, we conclude that the lower court correctly found that Continental had no duty to defend its insured, Monaco, under the terms of the policy which excluded coverage for fraud. We affirm the order of the lower court dissolving the writs of execution.

Order affirmed.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

The decision in this case was made prior to the retirement of HOFFMAN, J.