## COMMERCIAL UNION INSURANCE COMPANY

v.

## PITTSBURGH CORNING CORPORATION, et al.

### Civ. A. No. 81–2129.

United States District Court,
E.D. Pennsylvania.

Dec. 4, 1981.

Anthony P. Katauskas, Jacobs, Williams & Montgomery, Chicago, Ill., James Lewis Griffith, Griffith & Burr, Philadelphia, Pa., for Commercial Union Ins. Co.

Richard M. Shusterman and John A. Murphy, Jr., Philadelphia, Pa., for Ins. Co. of North America.

Andrew C. Hecker, Jr., Eugene J. Maginnis, Jr., Philadelphia, Pa., for Travelers Indem. Co.

John M. Cramer, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., and Christopher K. Walters, Reed, Smith, Townsend & Munson, Philadelphia, Pa., for Pittsburgh Corning Corp.

Stewart Dalzell, Mark M. Wilcox, Tybe A. Brett, Philadelphia, Pa., for Lumbermen's Mut. Cas. Co.

David J. Armstrong, Dickie, McCamey & Chilcote, Pittsburgh, Pa., and Donald J.P. Sweeney, McWilliams & Sweeney, Philadelphia, Pa., for PPG Industries, Inc.

Henry Kolowrat, Jean W. Burns, Philadelphia, Pa., for Corning Glass Works.

MEMORANDUM

GILES, District Judge.

## I. INTRODUCTION

Numerous lawsuits alleging asbestos-related injuries have been brought against the Pittsburgh Corning Corporation ("Pittsburgh Corning"), a manufacturer of asbestos products. The parties in the instant declaratory judgment action asbestos-product manufacturers, their primary insurers, and their excess insurers. Resolution of certain pending motions for summary judgment will determine which party must bear the expense of defending the thousands of asbestos suits pending against Pittsburgh Corning, and which must pay for any liability incurred.

These important issues are presented by two sets of motions. The first (the "Defense Motions") seeks a declaration whether Pittsburgh Corning's insurance contract with Travelers Indemnity Company ("Travelers") requires the insurer to continue to defend suits even though the monetary limits of its policy are exhausted. The second set (the "Coverage Motions") seeks a declaration whether insurance written by Commercial Union Insurance Company ("Commercial Union") covers asbestos injuries (1) resulting from exposure to asbestos during the policy period, as opposed to (2) manifesting themselves during the policy period. For the reasons which follow, the court decides that Travelers must continue to defend despite exhaustion of monetary limits,

and that Commercial Union's policies apply to injuries resulting from exposure during the policy period.[1]

## II. BACKGROUND

The parties to this litigation are the insured, Pittsburgh Corning; its co-owners, PPG Industries, Inc. ("PPG"), and Corning Glass Works ("Corning"); the insured's primary insurance carriers, Travelers Indemnity Company ("Travelers"), Insurance Company of North America ("INA"), and Lumbermans Mutual Casualty Company ("Lumbermans"); and the insured's excess carrier, Commercial Union Insurance Company ("Commercial Union").[2] The case was brought as a declaratory judgment by the excess carrier alleging that the other parties acted to improperly exhaust the primary liability limits, thus prematurely calling on the excess carrier to fulfill its obligations. The insured counterclaimed against the excess carrier,[3] asking for a declaration that the excess coverage covers injuries caused by exposure to asbestos during the policy period. The insured also cross-claims against its primary carrier, Travelers,[4] asking for a declaration that the primary insurer owes a continuing duty to defend despite exhaustion of the primary liability limits.[5]

## III. DEFENSE MOTIONS

Cross motions for summary judgment require an adjudication of the primary insurer's obligation to defend its insured despite exhaustion of the liability limits. In a motion for partial summary judgment, the insured contends that the insurer must continue to defend asbestos suits, and in a cross-motion, the insurer contends that it has no duty to defend once its liability limits are exhausted.[6]

### A. Arguments

#### 1. Insured's Position

The insured cites three bases for a continuing duty to defend: the insurance contract, an agreement among the primary carriers ("Intercompany Agreement"), and equity. First, the insured contends that the contract creates separate duties to indemnify and defend. Arguing that the contract is unambiguous, the insured states that Pennsylvania law and a line of cases starting with *Anchor Casualty Co. v. McCaleb*, 178 F.2d 322, 325 (5th Cir.1949), support the proposition that the policy creates a continuing duty to defend. Alternatively, if the policy is ambiguous, it argues that Pennsylvania law requires construction in favor of the insured, with the same result. Second, the insured relies on the statement in the Intercompany Agreement that cases pending on January 1, 1979, will continue to be handled to their conclusion by the carriers. The insured argues that the Intercompany Agreement constitutes an enforceable voluntary agreement to defend it. Finally, the insured contends that it would be unfairly prejudiced if its insurer were allowed to withdraw in mid-course from the investigation, administration, and defense of the thousands of outstanding claims against Pittsburgh Corning.

1. A brief order, dated October 29, 1981, informed the parties of the results of the motions, and anticipated this memorandum opinion.

2. The primary insurers cover the insured for liability up to a set sum. Once the primary coverage is exhausted, the excess carrier's coverage takes over.

3. Pittsburgh Corning is the beneficiary of excess-insurance policies purchased by its parents, PPG and Corning, from Commercial Union. These policies are also in issue.

   In addition, the insured seeks attorney fees and costs for the excess carrier's alleged bad-faith failure to perform its duties.

4. Although this case involves more than one insured and primary carrier, I shall refer to Pittsburgh Corning as the "insured," and to Travelers as the "primary carrier."

5. The insured also demands attorney fees, compensatory damages, and punitive damages for Travelers' refusal to defend. There are also miscellaneous contingent cross-claims between other parties.

6. The insured, Pittsburgh Corning, is joined in its position by PPG and Corning, as well as the excess insurer, while Travelers is joined by the other primary insurers.

## 2. Insurer's Position

While claiming that the policy is unambiguous, the insurer, on the other hand, gives it exactly the opposite meaning as the insured. The insurer also relies on a contrary line of case authority, starting with *Lumbermen's Mutual Casualty Co. v. McCarthy,* 90 N.H. 320, 8 A.2d 750 (1939). Alternatively, the insured argues that if the policy is ambiguous, Pennsylvania law requires interpretation like that of any other contract—in accord with the objective intent of all parties—and that the parties objectively intended no continuing duty to defend. The insurer points out that the insured was not a party to the Intercompany Agreement, and because the insured is neither an explicit nor intended beneficiary, it cannot enforce that agreement. Finally, the insurer states that it has arranged for an orderly transition of defense to the insured, such that no prejudice would result thereby.

## B. *Discussion*

A motion for summary judgment must be granted if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ. Pro. 56(c). The parties argue, and I agree, that the material facts are undisputed.[7] What remains is to apply Pennsylvania law.[8]

### a. *Ambiguous Insurance Policies Under Pennsylvania Law*

A key aspect of Pennsylvania law is the rule that all ambiguities in the policy provisions "must be resolved in favor of the insured." *St. Paul Fire & Marine Insurance Co. v. United States Fire Insurance Co.,* 655 F.2d 521, 524 (3d Cir.1981); *accord, e.g., Cohen v. Erie Indemnity Co.,* 288 Pa.Super. 445, 432 A.2d 596, 597 (1981). Application of this rule would mean that the insurer here cannot prevail unless the policy is clearly and unambiguously in its favor.

The insurer, however, citing *Brokers Title Co. v. St. Paul Fire & Marine Insurance Co.,* 610 F.2d 1174 (3d Cir.1979), contends that it should escape this strict rule. In *Brokers Title,* the Third Circuit held that the rule of strict construction did not govern policy in that case and therefore ordinary contract principles controlled. There, the issue was whether an exclusion clause would be given effect. The normal Pennsylvania rule is that an exclusion is of no effect unless the insurer proves that the effect of the exclusion was explained to the insured. The district court found that the clause had been read to the insured, but its effect was never explained, and he did not understand the meaning of the clause. The insured was himself an insurance broker and presi-

---

**7.** The parties also assume that I have jurisdiction over this claim. The jurisdictional issue merits more concern than the parties have given it, as is shown by Judge Troutman's opinion in *AC & S, Inc. v. Aetna Cas. & Sur. Co.,* 500 F.Supp. 511 (E.D.Pa.1980) (dismissing as nonjusticiable suit asking for declaration that the policy covers asbestos injuries stemming from exposure during the policy period), *appeal docketed,* No. 80–2659 (3d Cir. Nov. 20, 1980), as well as Judge Bazelon's discussion in *Keene Corp. v. Insurance Co. of N. Am.,* 667 F.2d 1034 at 1039 (D.C.Cir.1981) (similar case is justiciable).

Upon consideration, I agree that I have jurisdiction. There is diversity between the claimants. Like most suits to determine if the insured is required to defend, a declaratory judgment action presents a constitutionally justiciable controversy. *See, e.g.,* 10 C. Wright & A. Miller *Federal Practice and Procedure* § 2760, at 794 n. 42 (1973 & Supp.1980) [hereinafter cited as Wright & Miller]. *See generally id.* §§ 2757–2760; *see also Keene Corp., supra,*

667 F.2d at 1039. That an actual controversy exists here is demonstrated by Travelers' withdrawal from the defense of ongoing cases and Pittsburgh Corning's attempt to enjoin that withdrawal. *See* Pittsburgh Corning Corporation's Motion for Preliminary Injunction, filed June 25, 1981. I also note that unlike *AC & S,* the facts of asbestos actions against the insured are irrelevant to the claims here. Thus, because this action does not depend on facts involved in the underlying liability cases, it would be illogical to dismiss this suit as insufficiently specific. Finally, a declaratory judgment will terminate the insecurity to all parties arising from the uncertainty as to who must defend those cases.

**8.** The parties agree that Pennsylvania law controls in this diversity action. I also agree because Pennsylvania has the most significant contacts to this case. The key element is that the bulk of activity covered by the policies took place in this state.

dent of a title-insurance firm. He had dealt with policies containing exclusions. The parties were "of relatively equal bargaining power." Under these particular facts, the Third Circuit concluded that the strict-construction rule (which would ignore the exclusion) did not apply.

That holding, however, does not allow the insurers here to avoid the strict-construction rule. First, *Brokers Title* treated an unambiguous exclusion; this court confronts a purportedly ambiguous clause having nothing to do with exclusions. This difference is substantive, not formal. It is harsher, and a greater departure from normal contract law, to tell an insurer that favorable unambiguous clauses will be ignored than to tell it that ambiguous clauses will be construed against it. *See, e.g., Restatement (Second) of Contracts* § 206 (1981) (usual contract-interpretation rule is construction of ambiguous terms against drafter). Second, the key aspect of *Brokers Title* is that the insured there, unlike the insured here, was in the insurance business. Thus, if *Brokers Title* applies to ambiguous non-exclusionary clauses, it is distinct from this case. The insurers in this case propose a rule requiring courts to balance the economic resources of the parties to insurance contracts. This was not a consideration in *Brokers Title.* Finally, because Pennsylvania courts have applied the strict-construction rule to both consumer and commercial insurance, the balance of economic resources does not create an exception to that rule.

b. *Construction of Defense Clause*

Because the clause at issue in the Defense Motions is (from the insurer's perspective) at best ambiguous, the policy must be construed in the insured's favor. The ambigui-

ty concerning the insurer's defense obligations is evident from both the policy language and the cases construing similar language.

The relevant policy language reads:

*With respect to such insurance as is afforded* by this policy, the company [(Travelers)] shall:

(a) defend *any suit* . . . .

. . . .

and the amounts so incurred, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy.[9]

The insured maintains this language means that the insurer must defend "any suit" which might give rise to the type of liability to which the policy is directed. The insurer interprets the clause "such insurance as is afforded" to limit defense obligations both by type and amount of coverage. Both interpretations are reasonable and plausible. Therefore, on its face, the policy term must be found ambiguous. *But see McCarthy* cases cited in note 11 *infra.* This finding of ambiguity is borne out by the insurance industry's later redrafting of policies to eliminate the problem posed by the Defense Motions. A typical newer policy says that the insurer "shall not be obligated to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."[10]

Each party also relies cases construing insurers' defense obligations. The insured cites a line of cases beginning with *American Casualty Co. v. McCaleb,* 178 F.2d 322 (5th Cir.1950), while the insurer would follow the line represented by *Lumbermen's Mutual Casualty Co. v. McCarthy,* 90 N.H. 320, 8 A.2d 750 (1939).[11]

---

**9.** Comprehensive General Liability Policy, ¶ II, Affidavit of Robert E. Buckley, Exhibit A, (emphasis added).

**10.** 7C J. Appleman, *Insurance Law and Practice* § 4682, at 37 n. 62 (Berman ed. 1979) (quoting 1978 Comprehensive General Liability Insurance policy).

**11.** The *McCaleb* line, relied on by the insured, generally holds that to some extent, the insurer must defend although indemnification coverage may be exhausted. The cases are: *American Cas. Co. v. Howard,* 187 F.2d 322 (4th Cir. 1951); *American Cas. Co. v. McCaleb,* 178 F.2d 322 (5th Cir.1950); *Simmons v. Jeffords,* 260 F.Supp. 641 (E.D.Pa.1966) (per John W. Lord, J.); *National Cas. Co. v. Ins. Co. of N. Am.,* 230 F.Supp. 617 (N.D.Ohio 1964); *Travelers Indem.*

No case in either line is one that this court is obligated to follow. Only one, *Simmons v. Jeffords*, 260 F.Supp. 641 (E.D.Pa. 1966), interprets Pennsylvania law. Therefore, I shall undertake, as I must, to predict which rule of law would be adopted by the Pennsylvania Supreme Court, and how that rule would apply to this case.

The Pennsylvania decisions relating to an insurer's duty to defend do not offer a firm basis for such a prediction. Those cases, however, restate three guiding principles concerning the relation between an insurer's duty to defend and its duty to indemnify. The first is that the two duties are separate and distinct. *E.g., Gedeon v. State Farm Mutual Automobile Insurance Co.,* 410 Pa. 55, 58–59, 188 A.2d 320, 321–22 (1963); *Brugnoli v. United National Insurance Co.,* 284 Pa.Super. 511, 426 A.2d 164, 166 (1981); *Seaboard Industries, Inc. v. Monaco,* 258 Pa.Super.Ct. 170, 179, 392 A.2d 738, 742–43 (1978). The second is that the insurer may have an obligation to defend although it may have no duty to indemnify. *E.g., Gedeon,* 410 Pa. at 58–59, 188 A.2d at 321–22. Where an injury is covered by the policy, the insurer must defend, but if it prevails in the defense, it obviously need not indemnify.

The third principle is that the insurer need not defend a suit "based on a cause of action excluded from the policy coverage." *Seaboard Industries,* 258 Pa.Super.Ct. at 179, 392 A.2d at 743. This principle is sometimes expressed in different language. *E.g., Gedeon,* 410 Pa. at 58, 188 A.2d at 321 (insurer must defend a claim which "may *potentially* come with the coverage of the policy") (emphasis in original); *Seaboard Industries,* 258 Pa.Super.Ct. at 179, 392 A.2d at 743 ("the insurer has a duty to defend until it can confine the claim to a recovery excluded from the scope of the policy"). This principle comes closest to controlling the current case. None of these cases, however, is exactly on point, because in each, the only dispute was whether the cause of action was of a type covered by the policy and the policy limit had not been reached.[12]

Another difficulty in applying these decisions stems from the fact that minor differences in case language become significant here. If the defense obligation depends on whether a "cause of action" is excluded from policy coverage, then the duty to defend must be measured against the type of coverage. If, however, the test is whether there *may potentially be a duty to indemnify,* then amount of coverage also becomes critical, for once the policy limit is exhausted, the insured obviously need not indemnify.

Keeping these principles in mind, I predict that Pennsylvania would reject the *McCarthy* cases, *see* note 11 *supra,* and apply the *McCaleb* cases and hold that the

---

*Co. v. East,* 240 So.2d 277 (Miss.1970); *St. Paul Fire & Marine Ins. Co. v. Thompson,* 150 Mont. 182, 433 P.2d 795 (1967), *annotated in* 27 A.L. R.3d 1048 (1969); *Kosce v. Liberty Mut. Ins. Co.,* 159 N.J.Super. 340, 387 A.2d 1259 (Super. Ct.Law Div.1978); *American Employers Ins. Co. v. Goble Aircraft Specialties, Inc.,* 205 Misc. 1066, 131 N.Y.S.2d 393 (Sup.Ct.1954), *appeal withdrawn,* 1 App.Div.2d 1008, 154 N.Y.S.2d 835 (1956).

The cases following *McCarthy,* cited by the insurer, each somehow tie exhaustion of the duty to defend to exhaustion of the liability coverage. They are: *General Cas. Co. v. Whipple,* 328 F.2d 353 (7th Cir.1964); *Denham v. LaSalle-Madison Hotel Co.,* 168 F.2d 576 (7th Cir.), *cert. denied,* 335 U.S. 871, 69 S.Ct. 167, 93 L.Ed. 415 (1948); *Allstate Ins. Co. v. Montgomery Trucking Co.,* 328 F.Supp. 415 (N.D.Ga. 1971); *Commercial Union Ins. Co. v. Adams,* 231 F.Supp. 860 (S.D.Ind.1964); *National Un-*

*ion Ins. Co. v. Phoenix Ins. Co.,* 301 A.2d 222 (D.C.1973); *Liberty Mut. Ins. Co. v. Mead Corp.,* 219 Ga. 6, 131 S.E.2d 534 (1963); *Oda v. Highway Ins. Co.,* 44 Ill.App.2d 235, 194 N.E.2d 489 (1963); *Travelers Indem. Co. v. New Eng. Box Co.,* 102 N.H. 380, 157 A.2d 765 (1960); *Lumbermen's Mut. Cas.Co. v. McCarthy,* 90 N.H. 320, 8 A.2d 750 (1939). *See Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyds of London,* 56 Cal.App.3d 791, 129 Cal.Rptr. 47 (1976).

*See generally, e.g.,* 7C J. Appleman, *supra* note 10, § 4682, at 34–40; Annot. 27 A.L.R.3d 1057 (1969 & Supp. 1981).

12. *But cf. Nichols v. American Cas. Co.,* 423 Pa. 480, 484, 225 A.2d 80, 82 (1966) (when there is a possibility of verdict in excess of liability limit, the most cautious practice for the insurer is to advise insured to secure separate counsel).

insurer must continue to defend after exhaustion of policy limits. First, the *McCarthy*-line holding that the insurer may pay the limit of its policy into court and walk away from defense of cases[13] contradict Pennsylvania law.[14] *See Simmons v. Jeffords,* 260 F.Supp. 641, 642 (E.D.Pa.1966).

I also am certain that Pennsylvania would follow the *McCaleb* decisions so as to preclude the insurer from abandoning the defense suit pending when policy limits are exhausted by actual settlements or judgments.[15] This result accords with Pennsylvania law because of Pennsylvania's protection of insureds generally, and its rule of strict construction against the insurers, generally.

The insurer attempts to distinguish the *McCaleb* cases on their facts, arguing that they preclude paying the policy limit into court and abandoning the defense, while what has happened here is exhaustion of the liability limits through actual settlements or judgments. Although the insurer correctly characterizes some of the *McCaleb* cases,[16] others go further, requiring the insurer to continue defenses which were under way when the liability limits were exhausted, or even requiring that the insurer defend suits brought after exhaustion. *See* note 15 *supra.*

Another suggested factual distinction is that unlike the *McCaleb* insurers, the insur-

er here faces infinite defense costs because of the vast number of potential asbestos claimants. This argument has two flaws. First, it confuses the "infinite" with the "indefinite." The possibility of many added lawsuits does not mean that defense costs will be unlimited. In fact, the insurer may compute a rough limit by multiplying the number of workers exposed to asbestos by the cost of defending an average suit. A second flaw in the argument is that the risk of indefinite defense costs faces any insurers. That risk arises from the possibility of large numbers of unsuccessful suits against the insured. Because the insurer will win all of these, the liability limits will never be reached, so it must continue paying for defense.

■ Finally, the insurer contends that tying defense obligations to liability limits will neatly divide defense responsibilities between primary and excess carriers; by wedding defense duties to policy limits, it would be clear when each insurer (or the insured) must take over. I agree that this is the most sensible way to allocate defense obligation. The court, however, may not impose whatever allocation it thinks best. I am restricted to interpreting the contract. Furthermore, my decision does not preclude a later assignment of defense to the excess carrier. I hold only that the primary insur-

---

**13.** *See Denham v. LaSalle-Madison Hotel Co.,* 168 F.2d 576, 584 (7th Cir.), *cert. denied,* 335 U.S. 871, 69 S.Ct. 167, 93 L.Ed. 415 (1948).

**14.** My reference to *McCarthy* as a "line" of cases, and my characterization of the parties' positions as relying on those lines is an oversimplification. Some of the *McCarthy* cases can be reconciled with some of the *McCaleb* cases. Furthermore, there are numerous distinctions and contradictions within each line. As an example of both these points, *McCarthy* itself contradicts the cases cited in note 13 *supra* in stating that the insurer may not shift the defense burden to the insured merely by paying the policy limit. 8 A.2d at 750.

**15.** *See St. Paul Fire & Marine Ins. Co. v. Thompson,* 150 Mont. 182, 433 P.2d 795 (1967) (although tortfeasor's policy limit had been paid to victim as result of a judgment, insurer was obliged to defend subsequent suit for indemnity by joint tortfeasor); *Kosce v. Liberty Mut. Ins. Co.,* 159 N.J.Super. 340, 387 A.2d

1259 (Super.Ct.Law Div.1978) (insurer obliged to continue defending suit although it paid policy limit in actual settlement); *American Employers Ins. Co. v. Goble Aircraft Specialties, Inc.,* 205 Misc. 1066, 131 N.Y.S.2d 393 (Sup.Ct. 1954) (court refuses to declare that in event of liability exhaustion, insured need not "continue the defense of any action then pending or any new actions thereafter commenced," holding instead that insurer was "obligated to defend any action against the assureds based upon a wrongful death"), *appeal withdrawn,* 1 App. Div.2d 1008, 154 N.Y.S.2d 835 (1956).

**16.** *American Cas. Co. v. Howard,* 187 F.2d 322 (4th Cir.1951); *American Cas. Co. v. McCaleb,* 178 F.2d 322 (5th Cir.1950); *Simmons v. Jeffords,* 260 F.Supp. 641 (E.D.Pa.1966); *National Cas. Co. v. Ins. Co. of N. Am.,* 230 F.Supp. 617 (N.D.Ohio 1964); *Travelers Indem. Co. v. East,* 240 So.2d 277 (Miss.1970).

er owes the insured a duty to defend; I do not decide the priority of defense obligations among the insurers. *Cf. Aetna Casualty & Surety Co. v. Certain Underwriters at Lloyds of London,* 56 Cal.App. 791, 799, 129 Cal.Rptr. 47, 52 (1978) (apportionment of defense costs among primary and excess carriers cannot be made by reference to the primary policy alone); *National Union Insurance Co. v. Phoenix Assurance Co.,* 301 A.2d 222, 225 (D.C.1973) (primary policy gives no cause of action by excess carrier against primary insurer).

#### c. *Intercompany Agreement*

■ The insured also contends that a duty to defend arises from the agreement primary insurers that the defense of all suits pending as of January 1, 1979, would be allocated among the carriers. The insured argues that under *Guy v. Liederbach,* 279 Pa.Super. 543, 421 A.2d 333 (1980), and the *Restatement (Second) of Contracts* § 302 (1981), it is an intended beneficiary of the agreement, and therefore can sue to enforce it. The Intercompany Agreement itself states that its purpose is to benefit the primary insurers. The point of the agreement is to avoid the possibility of disputes among the carriers as to who is obliged to defend, and pay for the defense of, pending lawsuits. The insured is neither an explicit nor intended beneficiary; its gain is incidental. *See id.* § 302(2). The Intercompany Agreement therefore gives it

no rights against the primary carriers. *See id.* § 315.

#### d. *Equity*

■ The insured finally contends that the primary carrier must continue to defend because the insured would be prejudiced by the insurers withdrawal from the defense. All parties agree that the law prevents an insurer from prejudicing the insured by the manner of its withdrawal of the defense. The affidavits make clear that the insurer has offered to transfer the defense in an orderly manner. Boiled down, the contention is that the insurer can never transfer the defense of pending and future cases because of their size and number. This is simply not a "prejudicial" transfer which the law forbids.

### IV. COVERAGE MOTIONS

In the second set of motions,[17] the insured seeks a declaration that its excess insurance policy requires the insurer, Commercial Union, to indemnify it for liability caused by asbestos exposure during the policy period. The insurer proposes a conflicting interpretation that it must indemnify for asbestos injuries manifested during the policy period, and also submits that the issue is not ripe for summary judgment.

The latter point is troublesome.[18] Although the exposure versus manifestation

---

17. The second set includes the motions filed prior to the order of October 29, 1981, *see* note 1 *supra,* as well as the motions for reconsideration of that order.

18. In addition, essentially the same jurisdictional problems exist for this claim as for the insured's claim against the primary carrier. *See* note 7 *supra.* For essentially the same reasons, I hold that I have jurisdiction over this claim too. *See id.*

   Another potential jurisdiction problem is presented by Commercial Union's appeal from part of the Order of October 29, 1981. *See* note 1 *supra.* This is problematic because the filing of a notice of appeal normally divests the district court of jurisdiction. *E.g.,* 9 *Moore's Federal Practice* ¶ 203.11, at 3–44 to –47 (1980).

   One recognized exception to this rule is that a notice of appeal from a non-appealable order may be ignored by the lower court. *See id.* at

3–51 to –52. *But see id.* at 3–52 to –54. The order of October 29th obviously is interlocutory and non-appealable. (Motions to certify have been filed by several parties, including Commercial Union.) The Third Circuit generally follows this exception. *See, e.g., United States v. Leppo,* 634 F.2d 101, 104–105 (3d Cir.1980); *Plant Economy, Inc. v. Mirror Insulation Co.,* 308 F.2d 275, 277 n. 7 (3d Cir.1962); *but see District 65, Distributive Workers Union v. McKague,* 216 F.2d 153, 155 (3d Cir.1954) (once party appealed prematurely, appeal could not be certified by district court because it "was without jurisdiction to enter any order which would affect the status of the appeal.") Because nothing in this memorandum "would affect the status" of Commercial Union's premature appeal, there is no jurisdictional barrier to filing the memorandum. *McKague,* however, puts in doubt whether this court has jurisdiction to consider Commercial Union's motion for

issue has been decided in other cases,[19] no decision seems to have been reached at such an early stage of the proceedings. Part of the trouble is the large volume of filings relating to what the parties believe to be disputed or undisputed material facts.[20] Upon careful examination of the excess insurance policy and Pennsylvania law, I believe the material facts to be simple.

For the reasons which follow, I hold in favor of an exposure theory based on either of two simple, uncontroverted, and indisputable facts: 1) asbestos disease is cumulative; and 2) some microscopic damage occurs before manifestation of the injury. *See, e.g., Insurance Co. of North America v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212, 1214 (6th Cir.1981), *petition for cert. filed,* 50 U.S.L.W. 5023 (U.S. July 31, 1981) (No. 81–198). By the former, I mean that asbestos diseases are caused by an accumulation over time of asbestos particles in the body. Particles accumulated during exposure, but before manifestation of an asbestos disease, are a cause-in-fact of the disease. The second fact statement is self-explanatory.

For several reasons, these are facts as to which there is no genuine dispute within the meaning of Fed.R.Civ.Pro. 56. First, they are propounded by the insured and undisputed by any competent statement or offer of proof of the excess insurer. Alter-

natively, they are facts which I can, and do notice.

The parties' debate on notice centers around Fed.R.Evid. 201. I find that rule inapposite because the two key facts are not "adjudicative."[21] Adjudicative facts are those "about the particular event which gave rise to the lawsuit and . . . [which] explain who did what, when, where, how, and with what motive and intent." *McCormick, supra* note 22, § 328, at 758. This claim requires me to construe an insurance policy. That construction depends on the objective manifestation of the parties' intent. Thus, the adjudicative facts are the policy language and the facts giving the background of the contract formation. The etiology of asbestos disease is not an adjudicative fact for this claim.

The policies in issue here require the excess carrier to indemnify the insured for liability "on account of personal injuries . . . arising out of any one occurrence." Umbrella Policy ¶ I, Affidavit of Robert E. Buckley, Exhibit O. "Personal injuries" include "bodily injury, . . . sickness, [and] disease." *Id.* ¶ II(3). An "occurrence" means one or more "happenings arising out of or resulting from one event taking place during the terms of this policy." *Id.* ¶ II(4).[22] Thus, the excess insurer must indemnify for bodily injury, sickness, or disease arising

---

certification, or to conduct further proceedings on this claim.

(Because I have characterized the appeal as "obviously" premature, it is only fair to point out that I have no basis for believing it to be vexatious or in bad faith. Counsel often find appellate jurisdiction to be a mystery, resulting in a significant number of appeals from non-appealable orders. *See, e.g.,* Garth, *A View from Both Sides of the Bench,* 88 F.R.D. 93, 93–94 (1981).

19. *Keene Corp. v. Insurance Co. of N. Am.,* 667 F.2d 1034 (D.C.Cir.1981); *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th Cir.1981), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir.1980), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.,* 523 F.Supp. 110 (D.Mass.1981).

20. In addition the parties have favored me with their briefs in other cases, their certiorari petitions and appendices, letters interpreting opinions in other cases, letters responding to letters interpreting opinions in other cases, and letters to other judges interpreting other cases.

21. The rule limits judicial notice only of adjudicative facts. *See* Fed.R.Evid. 201(a). *See generally, e.g.,* E. Cleary, *McCormick's Handbook of the Law of Evidence* § 328 (1972) [hereinafter cited as *McCormick*]; 1 J. Weinstein & M. Berger, *Weinstein's Evidence* §§ 201[01]– [03] (1980) [hereinafter cited as *Weinstein's Evidence*]. Alternatively, I hold these two facts to be noticeable as adjudicative facts under Fed.R.Evid. 201(b)(1) or (2).

22. The insurer cites language defining "occurrence" to include "continuous or repeated exposure to conditions which unexpectedly result in personal injury." This succinctly describes asbestos-disease etiology.

out of a causative event within the policy period.[23]

 Construing all ambiguities in the insured's favor, *see* part II.B.1 *supra,* asbestos exposure is an "occurrence." Because the exposure is a cause-in-fact of the eventually manifested disease, the insurer must indemnify for the disease. In addition, I note that the term "bodily injury" must be construed against the insurer to include the pre-manifestation microscopic damage. The only reasonable period to which to attach this injury is the exposure period; one cannot attribute an injury to later-occurring manifestation. Thus, the excess carrier must indemnify for asbestos injury caused by exposure during the policy period.[24]

My holding accords with that of each circuit which has reached the issue. *See Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981); *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th Cir.1981), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Insurance Co. of North America v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212 (6th Cir. 1980), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). *Contra, Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co.,* 523 F.Supp. 110 (D. Mass.1981) (Zobel, J.). The excess insurer seeks to avoid this result by turning this contract claim into a re-adjudication of the cause and development of asbestos disease. I have no doubt that the excess insurer has and can raise factual disputes.[25] None of those disputes, however, is material. The material facts are simple, uncontrovertable, and undisputed. As counsel for the insurer candidly admitted when asked if any medical evidence could exclude bodily injury prior to manifestation, the question whether there is "injury" within the meaning of the

policy is a legal question, not a medical one. N.T. 78–79.

**23.** Thus, in contrast to the policy in *Keene, supra* 667 F.2d 1034 at 1044 note 19, the policy here is unclear on whether the "occurrence" or the "injury" must occur during the policy period. This ambiguity also must be construed in the insured's favor.

**24.** Yet another interpretation requiring indemnification is that the bodily invasion by asbestos fibers is itself an injury.

**25.** For instance, the parties dispute whether microscopic damage occurs simultaneously with exposure.